FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2018 JUL -2 AM II: 12

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) | No. 76509-4-I |
| ERIC MATTHEW HOPPER, | ) ) | DIVISION ONE |
| Petitioner. | ) ) ) | UNPUBLISHED OPINION |
| | ) | FILED: July 2, 2018 |

LEACH, J. — Eric Hopper collaterally challenges his 2014 conviction for commercial sexual abuse of a minor. He claims that his trial counsel provided ineffective assistance because his counsel did not move to suppress evidence of his text messages. He called and sent text messages to the number listed in a Backpage.com advertisement featuring a photograph of an unidentifiable female with the fictitious name of "Whisper." He ultimately paid to have sex with K.H., the 16-year-old girl pictured in the ad. Although he believed that he was communicating with K.H. by text, he was actually communicating with her pimp, Allixzander Park. Hopper asserts that Park violated the Washington privacy act[1] by "intercepting" his "private communications" to K.H.

But the totality of the circumstances show that Hopper did not have a reasonable expectation of privacy in these text messages. Thus, his text messages to K.H. were not "private communications." Park did not violate the

---

[1] Ch. 9.73 RCW.

act, and Hopper's trial counsel acted reasonably in not requesting suppression of the text messages. We dismiss Hopper's petition.

## FACTS

In December 2012, Hopper searched Backpage.com[2] with the intent of purchasing sex. Backpage operated an online classified advertising service. Its users created and posted their own ads, including ads in the adult category. This category included ads for prostitution activity, often under the guise of an adult escort or entertainment service. The ads often featured pictures of women identified by false names and ages, along with hourly rates.

Hopper saw an advertisement for a woman named "Whisper," who he later learned was K.H. The ad stated that she was 19 years old. She was actually 16 years old. It listed a phone number that Hopper both called and contacted by text. When he contacted the number by text, he initially believed that he was communicating with K.H. But K.H.'s pimp, Allixzander Park, had listed his own number on the ad and was reading and responding to Hopper's text messages.

---

[2] The Department of Justice seized Backpage.com in April 2018. Press Release, U.S. Dep't of Justice, Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment (April 9, 2018), https://www.justice.gov/opa/pr/justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads.

In December 2012, police arrested Park and, with a warrant, searched his cell phone. K.H. told police that Hopper had paid to have sex with her and identified him from a photograph montage. The police located Hopper's home address from the text messages stored on Park's phone. The State charged Hopper with commercial sexual abuse of a minor. In March 2014, a jury convicted Hopper as charged. Hopper appealed his conviction. This court affirmed the conviction in an unpublished opinion.[3] Hopper now challenges his conviction with this personal restraint petition (PRP).[4]

## ANALYSIS

As a preliminary matter, the State asserts that this court's rejection of Hopper's privacy act claim on the merits in his direct appeal bars Hopper from raising this claim again in his PRP. Because our earlier opinion did not clearly address the merits of Hopper's current claim, we do not reach this issue.

Hopper claims that his trial counsel should have asked the trial court to suppress his text messages to K.H., which police found stored on Park's cellular phone. Because he does not establish that these text messages were "private communications" under the act, he does not show that his counsel's performance fell below an objectively reasonable standard of care. His claim fails.

---

[3] State v. Hopper, No. 71799-5-I (Wash. Ct. App. June 8, 2015) (unpublished opinion), http://www.courts.wa.gov/opinions/pdf/17995.pdf.
[4] On June 13, 2017, the clerk of this court granted the State's motion to transfer the record from his direct appeal.

## Standard of Review

To obtain collateral relief by a PRP, a defendant must show either an error of constitutional magnitude that gives rise to actual prejudice or a nonconstitutional error that "'inherently results in a complete miscarriage of justice.'"[5] An ineffective assistance of counsel claim is a claimed constitutional error. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel to help ensure a fair trial.[6]

Claims of ineffective assistance present mixed questions of law and fact, which this court reviews de novo.[7] To succeed on an ineffective assistance claim, the defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudiced him.[8] If a defendant submitting a PRP meets this burden, then he has necessarily met his burden to show a constitutional error that caused actual prejudice.[9]

---

[5] In re Pers. Restraint of Grantham, 168 Wn.2d 204, 212, 227 P.3d 285 (2010) (quoting In re Pers. Restraint of Isadore, 151 Wn.2d 294, 298, 88 P.3d 390 (2004)).

[6] See State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011); see also State v. Coristine, 177 Wn.2d 370, 375, 300 P.3d 400 (2013).

[7] In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

[8] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[9] In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

This court approaches an ineffective assistance of counsel claim with a strong presumption that counsel provided effective representation.[10] A petitioner can "'rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'"[11] This court evaluates the reasonableness of counsel's performance from "'counsel's perspective at the time of the alleged error and in light of all the circumstances.'"[12] To establish prejudice, the defendant must show a reasonable probability that the result of the trial would have been different without his counsel's deficient performance.[13] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[14] If a reviewing court concludes that a defendant fails to establish either prong of the test, it need not inquire further.[15]

## Washington Privacy Act

Hopper asserts that Park violated the act by "intercepting" his text messages to K.H., which he claims were "private communications." He contends that because evidence deriving from information obtained in violation of the act is inadmissible under the fruit of the poisonous tree doctrine, his trial counsel

---

[10] In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).
[11] Davis, 152 Wn.2d at 673 (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).
[12] Davis, 152 Wn.2d at 673 (quoting Kimmelman, 477 U.S. at 384).
[13] Strickland, 466 U.S. at 694.
[14] Strickland, 466 U.S. at 694.
[15] State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

performed deficiently when his counsel failed to move to suppress the relevant text messages that police found stored on Park's phone. Because we conclude that Hopper's text messages to K.H. are not "private communications," Park did not violate the act. This decision resolves this case. So we do not address Hopper's remaining arguments.

A privacy act violation occurs when "(1) a private communication transmitted by a device . . . was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private communication."[16] Hopper claims that his text messages to K.H. were "private communications" under the act because he intended them for her alone and they concerned illegal activity. Whether communications are private is a question of fact but may be decided as a question of law where, as here, the parties do not dispute the facts.[17]

The act does not define "private."[18] Instead, Washington courts have adopted the dictionary definition: "'belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private

---

[16] State v. Roden, 179 Wn.2d 893, 899, 321 P.3d 1183 (2014); see RCW 9.73.030(1)(a).
[17] Roden, 179 Wn.2d at 900.
[18] See ch. 9.73 RCW; Roden, 179 Wn.2d at 899.

communication . . . secretly: not open or in public.'"[19] "'[A] communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable'"[20] based on "the duration and subject matter of the communication, the location of the communication, and the presence of potential third parties."[21] Washington courts will generally presume that each of the two parties participating in the conversation intends it to be private.[22]

Hopper likens his case to State v. Roden[23] and State v. Townsend,[24] in which our Supreme Court held that the communications at issue were private. In Roden, the court held that Roden's text messages to Lee, his drug dealer, were private because Lee's cell phone number was a personal contact of Roden's, Roden did not use a group texting function, and his messages concerned illicit subject matter.[25] Similarly, in Townsend, the court held that Townsend's e-mail

---

[19] Roden, 179 Wn.2d at 899-900 (alterations in original) (internal quotation marks omitted) (quoting State v. Townsend, 147 Wn.2d 666, 673, 57 P.3d 255 (2002)).

[20] State v. Modica, 164 Wn.2d 83, 88, 186 P.3d 1062 (2008) (quoting State v. Christensen, 153 Wn.2d 186, 193, 102 P.3d 789 (2004)).

[21] Roden, 179 Wn.2d at 900.

[22] Roden, 179 Wn.2d at 900.

[23] 179 Wn.2d 893, 896, 900, 321 P.3d 1183 (2014).

[24] 147 Wn.2d 666, 670, 674, 57 P.3d 255 (2002).

[25] 179 Wn.2d at 896; see also State v. Kipp, 179 Wn.2d 718, 730-31, 317 P.3d 1029 (2014) (explaining that "incriminating statement[s] of a serious subject matter is the type of conversation protected under the act").

and ICQ[26] communications to a detective who he believed was a 13-year-old girl named Amber were private because they concerned illicit subject matter and because he told "Amber" not to "tell anyone about us."[27] The court explained, "[I]t is readily apparent from the undisputed facts that Townsend's subjective intention was that his messages to Amber were for her eyes only."[28]

By contrast, in State v. Goucher,[29] Goucher called the house of his drug dealer, Luis, while police were searching it pursuant to a warrant. A detective answered, and Goucher proceeded to buy cocaine from the detective.[30] Our Supreme Court held that because Goucher did not try to conceal his desire to buy drugs from a stranger, he accepted the risk that his drug purchase would not be confidential.[31]

Similarly, in State v. Clark,[32] our Supreme Court held that defendants' communications with a police informant who claimed that he wanted to purchase cocaine were not private. These conversations were "routine sales conversations . . . between the defendants and a stranger who happened to be

---

[26] "ICQ [is] an Internet discussion software program that allows real-time client-to-client communications." State v. Townsend, 105 Wn. App. 622, 625, 20 P.3d 1027 (2001), aff'd, 147 Wn.2d 666, 57 P.3d 255 (2002).

[27] Townsend, 147 Wn.2d at 670, 674.

[28] Townsend, 147 Wn.2d at 674.

[29] 124 Wn.2d 778, 780-81, 881 P.2d 210 (1994). Goucher addressed only whether the defendant's constitutional privacy rights were violated. Although it did not concern the privacy act, the case is relevant by analogy.

[30] Goucher, 124 Wn.2d at 780-81.

[31] Goucher, 124 Wn.2d at 786-87.

[32] 129 Wn.2d 211, 215, 916 P.2d 384 (1996).

an undercover police informant," which occurred in or near the informant's car parked on public streets, often in a "bazaar-like setting," and in front of third parties.[33] The court distinguished Roden from Clark with this explanation: "We have found information willingly imparted to an unidentified stranger falls outside the protection of the act, as do some conversations that take place in 'the presence of one or more third parties' in a 'marketplace atmosphere.'"[34]

Here, although Hopper had a subjective expectation of privacy in his text messages to K.H., this expectation was unreasonable. So he does not satisfy the objective prong of the test, and his claim fails. Hopper testified that he searched Backpage.com knowing that it contained advertisements for prostitution. He saw what he later learned was K.H.'s advertisement, which listed a phone number underneath a female's picture that did not show her face. Although the ad did not state her name, Hopper testified that the description implied she went by "Whisper."

He called the number with the intent of scheduling sex, and a female voice answered. K.H. testified that she did, in fact, speak to Hopper on the phone; she stated that individuals calling in response to the ad would call Park's phone and Park would give her the phone to talk to them. When Hopper called, he told her that he had seen her ad and wanted to negotiate a meeting. Hopper also sent

[33] Clark, 129 Wn.2d at 214-15, 228.
[34] Roden, 179 Wn.2d at 903 (quoting Clark, 129 Wn.2d at 228).

K.H. numerous text messages before he met her in person. He stated that she "seemed very nervous in text, but not via voice, about whether I would actually be there or not . . . [w]hich was a little confusing to me."

When K.H. met Hopper at his home, he recognized her as the woman with whom he believed he had been communicating because "her shape and overall appearance matched the ad." After they had sex, Hopper paid her $250. But soon after she left, he received a text message asking, "[D]id you give me $250?" At that point, he "started being very worried that she had a pimp." He stated that after that text conversation, "[i]t was really obvious that I wasn't talking to her." Days later, when Hopper attempted to set up another meeting with her through text, he was "fairly certain that [he] was talking to her pimp."

Similar to Townsend, who intended to communicate only with Amber, Hopper intended to communicate only with the woman pictured in the Backpage.com ad. Because Hopper called the number listed in the ad, a female voice answered, he told her that he had seen her ad on Backpage.com, and they discussed a time to meet, his text messages were "'for her eyes only.'"[35] It was not clear to him that he was communicating by text message with Park until after he had sex with K.H. And consistent with Roden, the fact that his communications with K.H. concerned illicit subject matter involving paying for sex

---

[35] Personal restraint petition at 22 (quoting Townsend, 147 Wn.2d at 674).

suggests that he intended his text messages to be private. In light of the general presumption that parties intend their conversations to be private and the fact that K.H. was the sole intended recipient of Hopper's communications concerning illegal activity, he manifested a subjective intent that his text messages to K.H. would remain private.

But Hopper's subjective expectation of privacy was objectively unreasonable. He responded to an ad on Backpage.com, a website notorious for advertising prostitution activity. The ad was titled "any way you want it 19" and featured an unidentifiable woman with a fictitious name. A reasonable person would not expect that contacting a stranger by text through the phone number listed in this advertisement would provide a legitimate opportunity for a private conversation with a known person. Even Hopper admitted that "the picture wasn't a good enough picture to clearly identify a specific person."

The facts here differ from Clark because Hopper's text messages did not occur in a "marketplace atmosphere" or in front of third parties. But, as in Goucher, Hopper told a stranger that he was interested in illegal activity. When he called the number listed in the ad, a woman answered who he believed was the woman in the ad, but when he proceeded to send text messages to the same number, he could not be sure whether a man or a woman was responding, let alone the woman in the ad. And, unlike Townsend, who began communicating

-11-

with "Amber" over e-mail and a discussion software program under pretense of developing a social relationship, Hopper called to directly solicit sex.

In addition, although Hopper was not certain that he was talking to a pimp until after he had sex with K.H., the fact that K.H. "seemed very nervous in text, but not via voice" confused him and indicated that, at a minimum, he was not talking with and text messaging the same person. And regardless of whether Hopper was initially aware of K.H.'s pimp, it is common knowledge that prostitutes often have pimps. Thus, even though Hopper subjectively intended for his text messages to K.H. to be private, his communications were not private because this expectation was unreasonable. Park did not violate the act when he recorded and stored Hopper's messages to K.H. on his cell phone.

## CONCLUSION

We dismiss Hopper's PRP. His trial counsel did not provide ineffective assistance by failing to move to suppress his text messages to K.H. because those messages were not "private communications" under the privacy act.

_Leach J._

WE CONCUR:

-12-