# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49755-7-II |
| Respondent, | |
| v. | |
| DARCY DEAN RACUS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Darcy Dean Racus appeals his convictions for attempted first degree rape of a child and communicating with a minor for immoral purpose. First, Racus argues that the trial court erred by denying his motion to suppress private communications he had with an undercover Washington State Patrol (WSP) detective because he did not consent to these communications being recorded, as required by the Washington Privacy Act (WPA).[1] Second, Racus argues that the trial court erred by not suppressing communications obtained after the undercover detective obtained authorization to record communications because there was no probable cause to believe that Racus was engaging in the commercial exploitation of a minor to have sex for a fee, as required by RCW 9.73.230. Third, Racus argues that the trial court erred by failing to instruct the jury on his proposed instruction of entrapment. Fourth, Racus argues that the State presented insufficient evidence to support the jury finding that he took a substantial step toward committing the crime of attempted first degree rape of a child. Fifth, Racus argues that the prosecutor committed multiple instances of misconduct that require reversal of his convictions.

---

[1] Ch. 9.73 RCW; RCW 9.73.030.

We hold that Racus's communications with the undercover detective that occurred before the authorization to record was issued (referred to as "pre-authorization communications") were private, but that Racus impliedly consented to the communications being recorded, and thus, the trial court did not err by denying the motion to suppress the pre-authorization communications. We also hold that probable cause supported the authorization to record Racus's communications, and thus, the trial court did not err by denying the motion to suppress Racus's communications with the undercover detective that occurred after the authorization to record was issued (referred to as "post-authorization communications"). We hold that the trial court did not err by refusing to give an entrapment instruction because the evidence did not support giving the instruction. We also hold that the State presented sufficient evidence to allow the jury to find that Racus took a substantial step toward committing the crime of attempted first degree rape of a child. Lastly, we hold that because Racus did not object at trial, and fails to show that any of the prosecutor's arguments were so flagrant and ill-intentioned that they could not have been cured with an instruction, he has waived his claim of prosecutorial misconduct. Thus, we affirm.

FACTS

I. BACKGROUND

On December 17, 2015, WSP Detective Sergeant Carlos Rodriguez posted an advertisement on Craigslist as part of an online sting operation by the Washington State Patrol Missing and Exploited Children's Task Force (MECTF). Detective Rodriguez posted the advertisement in the "casual encounters" section of Craigslist, posed as a parent seeking others to have sexual contact with their minor children. The advertisement stated, "Looking for a close

family connection - 2 dau, [ ] 1 son - w4w (Tacoma)." IV Verbatim Report of Proceedings (VRP)

at 602. The body of the advertisement stated,

> I just moved here and looking for someone to connect with my young family. Would like a woman's touch, but open to a man as well, must be discrete, no solicitations, open to presents. No RP.

IV VRP at 605.

Detective Rodriguez later explained that "dau" means daughters and "w4w" means woman for woman. Rodriguez posed as a fictitious mother, "Kristl," a single mother with three minor children, using an anonymous e-mail address. Rodriguez's computer used Google Hangouts software to preserve the text messages by persons who responded to the advertisement.

On December 17, Racus answered the advertisement. He then engaged in a series of e-mails and text messages with "Kristl," asking about having sex and asking about her children. The next day, Racus reinitiated contact though another series of e-mails and then text messages.

On December 18 at 4:00 PM, Detective Rodriguez obtained an authorization to record communications. The intercept authorization was based on Rodriguez's belief that there was probable cause to believe Racus would engage in the commercial exploitation of a minor for sex for a fee later that day when he met "Kristl" and her children. Based on the intercept authorization, Rodriguez recorded all communications with Racus after December 18 at 4:00 PM, including numerous additional text messages and two telephone calls that day related to Racus's desire to meet with the mother and her children for sex.

During the two telephone calls with "Kristl," Racus agreed to meet the mother and her children at their house to have sex and then obtained the address of "Kristl's" house. After arriving

at "Kristl's" house and greeting her, Racus was arrested. The State charged Racus with attempted first degree rape of a child and communicating with a minor for immoral purposes.[2]

Prior to trial, Racus filed a motion to suppress the communications that occurred before the authorization to record based on a lack of consent. Racus also moved to suppress the communications that occurred after the authorization to record based upon a lack of probable cause. The trial court reviewed the transcript of all of the communications both before and after the authorization to record communications, and found that Racus "implicitly or impliedly" consented to the recording of the pre-intercept communications and text messages. Clerk's Papers (CP) at 249-50. Accordingly, the court denied the motion to suppress the pre-intercept text messages. The trial also court ruled that probable cause existed to authorize the intercept, and denied the motion to suppress the post-intercept communications.

## II. JURY VOIR DIRE

During voir dire, the prosecutor asked the jurors specific questions about internet sites and the ability to buy sex online. He asked if the jurors knew what Backpage.com[3] was and mentioned that an executive from Backpage.com had been recently arrested. He then asked the venire, "[H]ow many of you knew that there is a sex for sale section in craigslist?" IV VRP at 449. He

---

[2] The State also charged Racus with commercial sexual abuse of a child. At the close of the State's case, the trial court dismissed the charge of commercial sexual abuse of a child.

[3] Backpage operated an online classified advertising service. *In re Pers. Restraint of Hopper*, __ Wn App. 2d __, 424 P.3d 228, 229 (2018). The United States Department of Justice seized Backpage.com in April 2018. *In re Pers. Restraint of Hopper*, 424 P.3d at 230 n.2 (citing Press Release, U.S. Dep't of Justice, Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment (April 9, 2018), https://www.justice.gov/opa/pr/ justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads).

also asked the venire about their thoughts on the legality of prostitution. The prosecutor referenced *To Catch A Predator* (MSNBC broadcast), discussed sting operations, and asked if police should be able to conduct sting operations as they did in this case.[4] Lastly¸ he asked whether any potential jurors who had sat on previous juries had failed to reach a verdict, and if so, whether they had found the experience frustrating. Racus did not object to any of these questions or statements.

### III. TRIAL TESTIMONY

At trial, Detective Rodriguez testified about the sting operation that resulted in Racus's arrest. Rodriguez explained that he completed an online form on Craigslist using a fictitious name, "Kristl," with an anonymous e-mail address. Using this name and e-mail address, he then typed the message and posted the advertisement in the "casual encounters" section of Craigslist, which is viewed by persons looking for people to engage in sex. He explained that each advertisement on Craigslist is assigned a unique post identification number that lists the date and time of the particular posting. He testified that a person responding to the advertisement would contact him using the e-mail address. He would respond via e-mail and then would attempt to have the person agree to respond back by text message and then by telephone.

The Craigslist advertisement posted on December 17 contained the phrase "looking for a close family connection." IV VRP at 602. Detective Rodriguez explained that he used this phrase because "close family . . . generally means something dealing with incest." IV VRP at 585. The advertisement also contained the phrase "open to presents." IV VRP at 605. Rodriguez explained that he used the words "presents," "gifts," and "donations" in the advertisement because those

---

[4] *To Catch a Predator* was a television show where a host confronts sex offenders prior to their arrest.

words are commonly used on Craigslist to suggest payment for a fee or the exchange of money for sex. IV VRP at 586-87. He also explained that the term "RP" as used in the advertisement means role play.

Racus responded to the advertisement on Craigslist on the same day it was posted. Racus's full name appeared in the e-mail response because Racus had an account with Craigslist. The post identification number "4747" on the first e-mail sent by Racus allowed Detective Rodriguez to verify that a person by the name of Darcy Racus was responding to the same Craigslist advertisement that he had posted in the Casual Encounters section earlier that day. IV VRP at 603.

Detective Rodriguez testified that he was able to capture, preserve, and record his communications with Racus using a Gmail account. Rodriguez was able to display the communications to and from Racus to the jury.

In his initial e-mail to "Kristl," Racus stated, "A little more detail, please." Detective Rodriguez responded by e-mail, "What are you looking for? I am looking for someone with close family experience. I was very close with my father and brother." Racus e-mailed that he was "looking to give a gal some oral and anything else sexual she needs." V VRP at 665. "Kristl" responded, "What are your age limits? My girls are nearly 12 and 8. My oldest is very mature for her age. More restrictions with the 8, but she is good for oral." V VRP at 666. Racus asked, "How old are you?" V VRP at 667. "Kristl" e-mailed, "I am 39, but this is more for them. I'm always present, but I'm into watching to make sure they are ok and happy." V VRP at 667.

Racus e-mailed, "Really need to be of legal age. A person can go to jail over that. If you are interested in receiving oral, I don't mind if they watch or even do their own thing. You have photos?" V VRP at 667. "Kristl" acknowledged that he could go to jail, and asked whether Racus

6

would feel more comfortable texting. Racus replied, "Do you host and when would this take place?" "Kristl" explained that the person would come to her place. Racus then e-mailed and asked, "You no longer interested? I have until 3." "Kristl" e-mailed that she was "not home till 4. Can do tomorrow. Text me [at the telephone number provided]. Text your name and word till three." V VRP at 675. In his last e-mail that day, Racus asked, "So what is it you are looking to get out of this? So we are on the up and up." V VRP at 677.

The next day, December 18, Racus reinitiated contact by text at 11:27 AM and asked, "Darcy till three. Is this free? Or are you looking for something?" V VRP at 679. Soon after, he e-mailed the same message in all capital letters. Racus e-mailed again and said, "What you wanting from me? You ask that I text you today and I did. No response. You still interested?" V VRP at 683. He then e-mailed, "Hello? Family connection?" V VRP at 698. In response, "Kristl" texted back, "Sorry, Darcy. So many people answer on here and it's hard to see who is real and not a flake." V VRP at 699. Racus texted back, "I am real." V VRP at 699. "Kristl" texted and asked what experience Racus had and what he wanted. Racus promptly texted, "Not much. Looking to give oral and maybe receive if all are clean. What is it you are looking for?" V VRP at 700. "Kristl" texted, "That sound[s] good[]. This is more for my family to have the same experience that I had growing up. My son is 13, my daughters are nearly 12 and 8." V VRP at 700.

After several texts, Racus asked if the mother wanted to meet. "Kristl" texted, "Not till I know what you want, hun, and I have a system. I have to talk to you first." V VRP at 708. He then texted, "Want to orally please a gal and have it done back to me. Or sex." V VRP at 708. "Kristl" texted, "So which one gal, hun? Oral pleasure is always good." V VRP at 709. Racus

texted, "Yes it is. Older or you." VRP at 709. "Kristl" texted that Lisa, her fictitious daughter, is nearly 12.

Racus and "Kristl" continued to text and then talked on the telephone. In response, Racus asked Kristl to explain the rules of the encounter, "Kristl" texted, "No pain, no anal, condoms if more than oral," Racus texted, "Ok. Good with that." V VRP at 714. After this message, at 4:00 PM, Detective Rodriguez requested and obtained an intercept authorization warrant from a supervisor based on his belief that Racus was going to engage in the commercial exploitation of a minor for a fee when he went to meet with "Kristl" later that day. The intercept authorized Rodriguez to record all communications with Racus from that point forward.

"Kristl" and Racus spoke on the telephone and during those calls, "Kristl" confirmed that Racus wanted to have oral sex. When "Kristl" asked Racus which of the daughters he would prefer to have sex with, he responded, "Lisa. Have a pic?" V VRP at 711. Rodriguez sent a picture of a young girl. During another telephone call, Racus mentioned Lisa's braces, as he saw them in the picture that "Kristl" sent him. "Kristl" assured Racus, that Lisa could give him oral sex, without scraping his genitals. Rodriguez then handed the telephone to another undercover officer posing as Lisa. Racus asked Lisa if she was looking forward to their meeting and she said yes and referred to all of her other friends' experiences.

Racus then coordinated with "Kristl" when and where to meet them. On his way to meet them, "Kristl" asked him to bring Skittles for Lisa, because "[s]he asked for some." V VRP at 716. Racus said he would try and then confirmed he had obtained a bag of Skittles and was bringing it for Lisa. Racus arrived at the agreed address provided by "Kristl." Another female

undercover officer posing as "Kristl" greeted Racus at the door of the house. Officers then arrested Racus.

### IV. JURY INSTRUCTIONS—ENTRAPMENT

Defense counsel proposed an instruction on the affirmative defense of entrapment. The prosecutor objected and stated that "the defense is only available to a defendant who admits the acts that are charged." VII VRP at 1096. The trial court ruled that it would not give the instruction because the facts did not support giving an instruction on entrapment.

### V. CLOSING ARGUMENTS

During closing arguments, the prosecutor said,

> There is a lot of circumstantial evidence I think as to why. I shouldn't say as to why. I guess I shouldn't say as to why. The why question becomes more problematic in the context of the sex offense, because I guess what I'm going to suggest to you folks is this. In our world, in our society, there are two kinds of people. One, the people who will engage in sex with children, and the other people who will not. There is no gray area in there. A lot of life isn't black and white. This is. You either will have sex with a child or you will not have sex with a child. And I'm going to suggest to you that the category of people who will not have sex with a child also will not talk about it as if they're going to do it. They won't have a conversation with anyone else that says, hey, how about oral sex with a kid, 11. She has braces, any of that kind of stuff. No one who will not actually go forward with that act, would even talk about that act.
>
> I'm going to suggest to you further, not only will people who won't have sex with a child will not talk to others about it, they won't even have that conversation in their own mind. They won't think to themselves at any point ever, huh, wonder what it would be like to have sex with an 11-year-old or I think I will have sex with an 11-year-old or I think I will talk about having sex about an 11-year-old. They will not do that. You know from [Racus's] own mind, I mean, own mouth that it piqued his interest to talk about close family connection.

VII VRP at 1132-33.

> When you evaluate credibility, ask yourself if it's reasonable what the defendant told you, which is 90 percent of [Craigslist advertisements] are unreal,

not real, and while I opened some ads for adult women, I followed through on this ad, but only because I wanted this mom. Keep in mind the defendant told you that—and you know that [C]raigslist sexual encounters-sorry, casual encounters, has ads with photographs. [Detective] Rodriguez told you, "I didn't pick an ad to show you folks that it had pictures, because quite frankly some of these pictures are pornographic, nudity, bestiality, child pornography."

VII VRP at 1142.

During rebuttal argument, the prosecutor focused on the credibility of the witnesses and explained what the term "abiding belief" meant:

Let's just talk one minute about the MECTF. These are—you saw five members, four members and a couple visiting members, for lack of a better word, of that task force. Those are folks whose lives and careers are dedicated toward protecting children. These are people who swim in the filth that's on the internet. By choice, they have to go in and read these ads. [Rodriguez] has to pose as a woman offering to sell children for sex. [Knoll] has to talk to the defendant, who wants to engage in sex with a child. [Gasser] has to pretend to be interested in sex as an 11-year-old with an adult. Can you really criticize what the MECTF is doing and what these folks are doing?

. . . .

Fifty-eight people have been arrested before they could have sex with a child. How is that a bad thing? Fifty-eight people have been arrested who showed up to have sex with a child before they could actually do it. At least that time. I'm not suggesting to you in any way at all that [Racus] did this before, because you don't have any evidence of that at all. I'm suggesting you judge what he did that particular day. And what he did, is he was one of the people who showed up to have sex with a girl who was 11, and got arrested before he could, because of the work that the [MECTF] does. For all of us who are in the category of it's too repulsive to even think about it, much less talk about it, much less do it.

VII VRP at 1172-73.

Let me back up one second. [Defense counsel] actually told you that the presumption of innocence is maintained, he still has it, until you go back there and start deliberating. That's not true. I have the burden of proof for the state. It's the highest burden in the law. And I want to make sure that you don't minimize it at all. He maintains his presumption throughout your deliberations, not just until you get there. Throughout your deliberations, he is presumed innocent until you find

10

that all of the mountain of evidence that you heard overcomes the presumption beyond a reasonable doubt. So absolutely, give him his constitutional right.

. . . .

After you return your verdict, [the judge] is going to release you from the instruction that you can't talk about this case. So when you go home after your verdict and your loved ones say, "Hey, are you done?" And you say, "Yeah." "What did you do?" "Well, we found the defendant guilty and here's the crime." Then they say to you, "Did you do the right thing?" And you say, "Yeah, we did." That's an abiding belief.

And a month later, when you're thinking about jury duty and you think to yourself, we did the right thing, that's an abiding belief. And then the next time you receive your jury summons, before you throw it away, or the next time you're talking to someone else who got a jury summons, you can tell them, "You know what? That's up to you, but when I was on jury duty, I did justice. I did the right thing." That's an abiding belief.

VII VRP at 1180-81. Racus did not object to any of these statements.

VI. VERDICT

The jury found Racus guilty of attempted first degree rape of a child and communicating with a minor for immoral purposes. The trial court sentenced Racus to a standard range sentence. He appeals his convictions.

ANALYSIS

I. COMMUNICATIONS BEFORE AUTHORIZATION

A. LEGAL PRINCIPLES

Racus first argues that the trial court erred by failing to suppress the pre-intercept recorded communications, e-mails and text messages, because he did not consent to their being recorded under the WPA. We disagree because Racus impliedly consented to the pre-intercept e-mails and

11

text messages being recorded under the WPA. Thus, we hold that the trial court did not err by denying his motion to suppress the pre-intercept communications.

The WPA provides that it is unlawful for any individual or for the State to intercept or record a private communication or conversation, by any device, electronic or otherwise, without obtaining the consent of all of the parties participating in the conversation. RCW 9.73.030(1)(a), (b). Under the WPA, a communication is private when parties manifest a subjective intention that it be private, and where that expectation is reasonable. *State v. Kipp*, 179 Wn.2d 718, 729, 317 P.3d 1029 (2014). Proof of subjective intent need not be explicit. *Kipp*, 179 Wn.2d at 729.

When analyzing alleged violations of the WPA, we consider (1) whether there was a private communication transmitted by a device, which was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit, and (4) was done without the consent of all parties to the private communication. *State v. Townsend*, 147 Wn.2d 666, 672-75, 57 P.3d 255 (2002). We review alleged violations of the WPA de novo. *Kipp*, 179 Wn.2d at 728.

B. PRIVATE COMMUNICATIONS

We first consider whether the communications between Racus and "Kristl" were private and whether the expectation that they be private was reasonable. *See Townsend*, 147 Wn.2d 672-74. Text messages encompass many of the same subjects as telephone conversations and e-mails, which have been protected under the WPA. *See State v. Faford*, 128 Wn.2d 476, 488, 910 P.2d 447 (1996); *Townsend*, 147 Wn.2d at 680. The term "private" is not defined in the WPA but we have adopted a dictionary definition: "'belonging to oneself . . . SECRET . . . intended only for the persons involved <a ~ conversation> . . . holding a confidential relationship to something . . . a secret message : a private communication . . . SECRETLY : not open or in public.'" *Kipp*, 179

Wn.2d at 729 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DISCTIONARY1804-05 (1969) (alterations in original); *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 190, 829 P.2d 1061 (1992).

Here, Racus thought he was texting "Kristl." He manifested his subjective intent that the text messages would remain private by not using a group texting function, or indicating in any other manner that he intended to expose his communications to anyone other than "Kristl." *See Townsend*, 147 Wn.2d at 673. The expectation that these were private communications was reasonable given that Racus was only texting with "Kristl" and "Kristl" was texting him back. Because he intended that the communications be kept private, and his expectation that they were private communications was reasonable, the communications were private under the WPA.

C. INTERCEPTED OR RECORDED BY USE OF A DEVICE DESIGNED TO RECORD AND/OR TRANSMIT

We next consider the second and third prongs of the test, whether the communication was intercepted or recorded by use of a device designed to record and/or transmit. *Townsend*, 147 Wn.2d 672. The parties do not dispute this fact. Here, Detective Rodriguez testified that his computer captured, preserved, and recorded all communications with Racus using the anonymous Gmail account and a Google software application installed on his computer as part of the sting operation. Thus, the communications were intercepted and recorded by use of a device designed to record and/or transmit under the WPA.

D. CONSENT

Lastly, we consider whether Racus consented to the communications being recorded. *Townsend*, 147 Wn.2d at 672. If Racus consented, then the recording was not unlawful under the WPA because it is not unlawful to record a communication on a device where the "consent of all

the participants in the communication" has been obtained. RCW 9.73.030(1)(a); *see* RCW 9.73.030(1)(b). A communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded. *See Townsend*, 147 Wn.2d at 672.

In *Townsend*, the police recorded and tracked the defendant's e-mail and instant messages to a fictitious adolescent girl that police created for a sting operation.[5] *Townsend*, 147 Wn.2d at 670. Our Supreme Court held that although the defendant did not explicitly announce that he consented to the recording of his e-mail and instant messages to his fictitious target, his consent to such recordings could be implied

> [b]ecause [the defendant], as a user of e-mail had to understand that computers are, among other things, a message recording device and that his e-mail messages would be recorded on the computer of the person to whom the message was sent, he is properly deemed to have consented to the recording of those messages.

*Townsend*, 147 Wn.2d at 676. The court noted that "the saving of messages is inherent in e-mail" and instant messaging, and that through his use and familiarity of such systems, the defendant had impliedly consented to the recording of such messages. *Townsend*, 147 Wn.2d at 678.

The Supreme Court stated,

> "A person sends an e-mail message with the expectation that it will be read and perhaps printed by another person. To be available for reading or printing, the message first must be recorded on another computer's memory. Like a person who leaves a message on a telephone answering machine, a person who sends an e-mail message anticipates that it will be recorded. That person thus implicitly consents to having the message recorded on the addressee's computer."

*Townsend*, 147 Wn.2d at 676 (quoting *State v. Townsend*, 105 Wn. App. 622, 629, 20 P.3d 1027

---

[5] The instant messaging software in that case was a software program called ICQ. *Townsend*, 147 Wn.2d at 669.

(2001).

Here, the pre-intercept communications sent by Racus to "Kristl" were communications made by Racus in response to an advertisement in the casual encounters section of Craigslist. Racus had created a Gmail account to use Craigslist and to respond to the advertisement posted by Detective Rodriguez. Racus also testified that he was aware that the text messages "would be preserved and potentially seen." VI VRP 1032. As a result, in his text messages to "Kristl," Racus avoided explicitly stating that it was his intent to engage in oral sex with "Kristl's" fictitious eleven-year-old daughter.

Similar to the defendant in *Townsend*, here, Racus had to understand that computers are message recording devices and that his text messages with "Kristl" would be preserved and recorded on a computer. *See Townsend,* 147 Wn.2d at 678. By communicating in this way, Racus impliedly consented to the communications being recorded, and thus, the recording of the communications was lawful under RCW 9.73.030(1)(a). Because the recording of the pre-intercept communications was lawful, the trial court did not err by denying Racus's motion to suppress the pre-intercept e-mail and text messages.[6] Thus, this argument fails.

---

[6] Racus also argues that the trial court erred by finding that Detective Rodriguez was the "intended recipient" of the messages; thus, Racus did not consent to the communications being recorded. Br. of App. at 30. However, this argument fails because our Supreme Court has held that a defendant's unawareness that the recipient of a message was a police detective does not destroy consent. *State v. Athan*, 160 Wn.2d 354, 371, 158 P.3d 27 (2007).

Racus also analogizes his case to *State v. Hinton*, 179 Wn.2d 862, 319 P.3d 9 (2014). Br. of Appellant at 29. In *Hinton*, the defendant sent text messages to a known associate, and unbeknownst to him, officers had his associate's telephone. *Hinton*, 179 Wn.2d at 865. That case is not analogous because the court in *Hinton* was addressing a claim under article I, section 7, not a claim under the WPA. *Hinton*, 179 Wn.2d at 877.

## II. COMMUNICATIONS AFTER AUTHORIZATION

Racus next argues that the trial court erred by not suppressing the post-intercept communications. Racus argues that Detective Rodriguez lied to the supervisor when he claimed that Racus and "Kristl" had a discussion about a fee, "trading gifts in exchange for sex with minors," as required for an intercept to be lawfully authorized under RCW 9.73.230(1)(b)(ii). Br. of Appellant at 33. Racus argues that no reasonable detective would have had probable cause to believe that Racus was engaging in the commercial sexual abuse of a minor. Therefore, he argues that the requirements of RCW 9.73.230(1)(b)(ii) were not met for the WSP supervisor to authorize an intercept to record the communications Racus had with "Kristl" after 4:00 PM on December 18. We disagree.

The WPA allows for communications to be recorded when authorized by someone above a "first line supervisor" if "probable cause exists to believe that the conversation or communication" will involve "[A] party engaging in the commercial sexual abuse of a minor." RCW 9.73.230(1)(b)(ii).

Former RCW 9.68A.100(1)(c) (2013) provides that a "person is guilty of commercial sexual abuse of a minor if . . . [h]e or she solicits, offers, or requests to engage in sexual conduct with a minor in return for a fee." The WPA also provides that "[a]ny information obtained in violation of RCW 9.73.030 . . . [is] inadmissible." RCW 9.73.050.

Probable cause exists where the facts and circumstances are within the officer's knowledge and the facts and circumstances are such that the officer has reasonably trustworthy information sufficient to warrant a person of reasonable caution to believe that an offense has been committed. *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986). Probable cause requires more than

a bare suspicion of criminal activity. *Terrovona*, 105 Wn.2d at 643. Whether probable cause exists is a legal question that we review de novo. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

Detective Rodriguez testified that the terms "presents," "gifts," and "donations" and the phrase "open to presents" as used in the advertisement, are used by persons viewing the Craigslist casual encounters section to suggest payment for a fee or the exchange of money for sex. IV VRP at 586-87, 605. Shortly after contacting "Kristl," Racus e-mailed and asked, "So what is it you are looking to get out of this? So we are on the up and up." V VRP at 677. When he did not receive a response, he followed up the next morning by sending an e-mail and then a text message asking, "Is this free? Or are you looking for something?" V VRP at 679-80. He then sent a series of e-mail and text messages, where the topic was "Kristl" attempting to set up sex between him and her daughter. Based on all of these communications, Rodriguez requested and obtained an intercept authorized by a supervisor.

In the case at bar, Racus responded to an advertisement that requested a sexual encounter with a minor, the advertisement used a colloquialism for payment, and Racus asked about payment. The communications that Racus exchanged with "Kristl" establish that he was aware that she was offering her two minor daughters for sex in exchange for a fee, and that Racus appeared interested in paying.

All of these communications demonstrate that Racus intended to exchange sex with a minor for a fee. Thus, we hold that based on the totality of the circumstances, there were facts that would lead a reasonable detective to conclude that probable cause existed to believe that Racus would engage in the commercial sexual abuse of a minor in exchange for a fee. Thus, the WSP properly

authorized the intercept to record the communications with Racus under RCW 9.73.230(1)(b)(ii).

Therefore, because intercept authorization was proper, we hold that the trial court did not err by

denying the motion to suppress the post-intercept communications.

## III. ENTRAPMENT

### A. LEGAL PRINCIPLES

Racus next argues that the trial court erred by not giving his proposed jury instruction on

entrapment. We disagree because the evidence did not support giving the instruction.

A trial court's refusal to give a proposed jury instruction is reviewed for an abuse of

discretion. *In re Det. of Pouncy*, 168 Wn.2d 382, 390, 229 P.3d 678 (2010). The trial court's

refusal to give an instruction based upon a ruling of law is reviewed de novo. *State v. Walker*, 136

Wn.2d 767, 771-72, 966 P.2d 883 (1998).

To obtain a jury instruction regarding a party's theory of the case, there must be sufficient

evidence supporting the requested instruction. *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d

1001 (2003). To prove the affirmative defense of entrapment, a defendant must show, by a

preponderance of the evidence, that he committed a crime, that the State or a State actor lured or

induced him to commit the crime, and that the defendant lacked the disposition to commit the

crime. *State v. Lively*, 130 Wn.2d 1, 9, 921 P.2d 1035 (1996); RCW 9A.16.070. Failure to prove

either of these prongs is fatal to the defense of entrapment. *Lively*, 130 Wn.2d at 9-10.

However, entrapment is not a defense if law enforcement "merely afforded the actor an

opportunity to commit a crime." RCW 9A.16.070(2). Neither the defendant's mere reluctance to

violate the law, nor the use of a normal amount of persuasion to overcome the defendant's

resistance is not entrapment. *State v. Trujillo*, 75 Wn. App. 913, 918, 883 P.2d 329 (1994). The

quantum of evidence required for an instruction to be given as an affirmative defense is sufficient evidence "to permit a reasonable juror to conclude that the defendant has established the defense of entrapment by a preponderance of the evidence." [7] *Trujillo*, 75 Wn. App. at 917.

## B. JURY INSTRUCTION NOT SUPPORTED

Here, Detective Rodriguez created a Craigslist advertisement that indicated that someone was looking for a man or woman to have sex with their minor children. Racus initiated contact by answering the advertisement in the casual encounters section on the Craigslist website. Though it is true that Racus originally said that he did not want to do anything illegal, he reengaged in communications the next day despite the fact that "Kristl" had told him that she only wanted the sexual encounter for her minor children. This evidence shows that the WSP simply afforded Racus the opportunity to commit the crime. WSP did not lure him or induce him to commit the crime and the evidence shows that Racus had the predisposition to commit the crime.[8] Because Racus failed to show by a preponderance of the evidence that he was entitled to a jury instruction on entrapment, we hold that the trial court did not err by refusing to instruct the jury on entrapment.

---

[7] Racus cites to *State v. Galisia*, 63 Wn. App. 833, 822 P.2d 303 (1992), for the proposition that only "some evidence" is needed to be introduced in order to support the giving of an entrapment instruction. Br. of Appellant at 35. However, that case was abrogated by *Trujillo* on the same issue. *Trujiilo*, 75 Wn. App. at 917.

[8] Though Racus appears to argue that WSP reinitiated or continued contact with him, Racus is the one who reinitiated communications on December 18.

IV. SUFFICIENT EVIDENCE OF A SUBSTANTIAL STEP

A. LEGAL PRINCIPLES

Racus argues that the State did not produce sufficient evidence to convince a jury that he took a substantial step towards committing the crime of attempted first degree rape of a child. We disagree.

Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence." *Salinas*, 119 Wn.2d at 201. All reasonable inferences must be drawn in favor of the State and interpreted most strongly against the defendant. *Salinas*, 119 Wn.2d at 201.

"A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073. "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1).

A substantial step is an action that is strongly corroborative of the defendant's criminal purpose. *State v. Johnson*, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). "Mere preparation to commit a crime is not an attempt." *State v. Wilson*, 1 Wn. App. 2d. 73, 83, 404 P.3d 76 (2017). However, any slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the accused to commit the crime. *Wilson*, 1 Wn. App. 2d. at 83.

B. SUFFICIENT EVIDENCE

Here, Racus communicated with "Kristl" about having sex, and admits that "Kristl's" stated intention was always that he have sex with her children. When asked which of the daughters he would prefer to have sex with, he responded "Lisa. Have a pic?" V VRP at 711. He also discussed details of what the sexual encounter would be and spoke to Lisa. He then coordinated with "Kristl" about when he would come to meet the mother and Lisa at their house. At "Kristl's" request, he purchased a bag of skittles for Lisa, went to the house, greeted "Kristl," and then entered the home. Taking all reasonable inferences in favor of the State, any rational trier of fact could have found that Racus's conduct is strongly corroborative of the criminal purpose of having sex with a minor who was under twelve years old.

Because the State proved Racus's desire to commit the crime and the actions he took in furtherance of the rape of a child, the State produced sufficient evidence for a reasonable jury to conclude that Racus took a substantial step towards the commission of the crime of attempted first degree rape of a child. Thus, Racus's sufficiency claim fails.

## V. PROSECUTORIAL MISCONDUCT

A. LEGAL PRINCIPLES

Racus argues that the prosecutor committed multiple acts of misconduct during trial that warrant reversal of his convictions. Racus claims that the prosecutor: (1) improperly conducted voir dire to educate the jury, indoctrinate them, and instruct them on the law, (2) improperly vouched for Detective Rodriguez, (3) diminished his burden of proof during closing, (4) made inappropriate comments during closing, and (5) committed various other inappropriate acts during the trial. Because Racus fails to show that any of the prosecutor's conduct was so flagrant and ill-

intentioned it could not have been cured with an instruction. We hold that his claim of prosecutorial misconduct is waived.

To prevail on a claim of prosecutorial misconduct, Racus must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Because Racus did not object at trial to any of this alleged misconduct, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. Because the Racus did not object, he is required to show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

When reviewing a prosecutor's misconduct that was not objected to, we focus "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762. When analyzing prejudice, we do not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). We also presume that the jury follows the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009).

B. VOIR DIRE

Racus first argues that the prosecutor's conduct during voir dire was improper because he used voir dire to argue his case, indoctrinate the jury, and to instruct the jury in the law. Racus

also argues that the prosecutor improperly asked whether any jurors had served on a jury before but failed to reach a verdict, and whether they found that experience frustrating.

RCW 4.44.120 provides that

> [w]hen the action is called for trial, a panel of potential jurors shall be selected at random from the citizens summoned for jury service who have appeared and have not been excused. A voir dire examination of the panel shall be conducted for the purpose of discovering any basis for challenge for cause and to permit the intelligent exercise of peremptory challenges.

The purpose of voir dire is to select an impartial jury, not to "'educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.'" *State v. Frederiksen*, 40 Wn. App 749, 752, 700 P.2d 369 (1985) (quoting *People v. Williams*, 29 Cal.3d 392, 628 P.2d 869, 877 (1981); *State v. Munzanreder*, 199 Wn. App. 162, 175, 398 P.3d 1160, *review denied*, 189 Wn.2d 1027 (2017).

Here, the prosecutor asked the jurors questions about online websites that had sections on the websites where individuals could pay for sex or find a partner for casual sex. He also asked the jurors about their general feelings about sting operations. In the context of the entire voir dire, these questions did not argue the prosecutor's case, nor were they designed in any way to prejudice the jury prior to hearing the evidence in the case. Rather, these questions were meant to discover any basis to challenge a potential juror for cause and to permit the exercise of preemptory challenges. Thus, because the questions did not argue the case or were an attempt to prejudice the jury, the questions were not improper.

However, one area of voir dire was troubling—when the prosecutor asked whether any jurors had previously served on a jury and whether any of the jurors were frustrated when the jury

panel could not reach a verdict. These questions may have implied that it was not proper for the jury not to reach a verdict. However, a jury is legally permitted not to reach a verdict. *See State v. Burdette*, 178 Wn. App. 183, 195, 313 P.3d 1235 (2013). Thus, these specific questions asked by the prosecutor were likely improper. However, Racus does not show how the prosecutor's arguments were so flagrant and ill-intentioned that they could not have been cured with an instruction. Thus, this claim is waived.

C. VOUCHING

Racus next argues that the prosecutor committed misconduct by questioning Detective Rodriguez in a manner that constituted improper vouching. We disagree.

A prosecutor commits misconduct by personally vouching for a witness's credibility or veracity. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *Ish*, 170 Wn.2d at 196. "Prosecutors may, however, argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

First, Racus claims that the State improperly vouched by questioning Detective Rodriguez about how many types of online sting operations he had conducted. This question does not express the prosecutor's personal belief, nor does it indicate that evidence not presented supports the detective's testimony. Further, the question and the response were tied to the specific evidence admitted at trial by Rodriguez about the sting operations. Because this line of questioning was

neither type of impermissible vouching and was tied to specific evidence, the question was not improper.

Second, Racus claims that during closing argument the State impermissibly vouched for Detective Rodriguez when it asked the jury whether or not it was reasonable that Rodriguez would have altered the e-mails. The prosecutor's argument related to specific testimony by Rodriguez regarding whether he could have altered any communications between "Kristl" and Racus. Thus, because the prosecutor was referring to testimony elicited at trial, he was not expressing his own belief or referring to evidence not admitted at trial. Because he did not express his own belief or refer to evidence not admitted at trial, Racus's claim of prosecutor misconduct on these bases is waived.

D. BURDEN SHIFTING

Racus next argues that the prosecutor diminished its burden of proof during closing argument. We disagree.

The State bears the burden of proving each element of its case beyond a reasonable doubt, and it may not shift any of that burden to the defendant. *State v. W.R.*, 181 Wn.2d 757, 762, 771, 336 P.3d 1134 (2014). First, Racus claims that the prosecutor lowered his burden of proving a substantial step when he said only people who would rape a child would think or discuss it and that "everyone else would be appalled at that thought." Br. of Appellant at 46. Racus argues that by saying this, the State essentially argued that a defendant who just thinks about or talks about having sex with a child has taken a substantial step toward committing the crime of first degree child rape. Racus mischaracterizes the implication of the State's argument that just thinking or talking about having sex with a minor constitutes a substantial step and this argument did not

diminish the State's burden. Because the State did not shift its burden of proving each essential element, this argument fails.

Second, Racus claims that the prosecutor diminished his burden of proof by equating a juror's abiding belief with a juror doing the right thing, which mischaracterized the burden of proof beyond a reasonable doubt. Racus analogizes his case to *State v. McCreven*, 170 Wn. App. 444, 284 P.3d 793 (2012). There, the court held that the trial court erred in not sustaining the defense counsel's objection to the prosecutor's closing argument because the prosecutor did shift its burden by equating a juror's abiding belief with a juror doing the right thing. *McCreven*, 170 Wn. App. at 473.

However, Racus's case is distinguishable. Here, the prosecutor explained to the jury what the term "abiding belief" means:

> After you return your verdict, [the judge] is going to release you from the instruction that you can't talk about this case. So when you go home after your verdict and your loved ones say, "Hey, are you done?" And you say, "Yeah." "What did you do?" "Well, we found the defendant guilty and here's the crime." Then they say to you, "Did you do the right thing?" And you say, "Yeah, we did." That's an abiding belief.

> And a month later, when you're thinking about jury duty and you think to yourself, we did the right thing, that's an abiding belief. And then the next time you receive your jury summons, before you throw it away, or the next time you're talking to someone else who got a jury summons, you can tell them, "You know what? That's up to you, but when I was on jury duty, I did justice. I did the right thing." That's an abiding belief.

VI VRP at 1180-81. Contrary to Racus's argument, the prosecutor did not imply or tell the jury that they only need to have an abiding belief in the truth of the charge, but he described what exactly the term "abiding belief " meant. Importantly, right before the explanation of abiding

26

belief, the prosecutor explicitly described what the State's burden of proof was and how high of a burden it was.

Thus, the State did not diminish its burden of proof.  Because the State did not diminish its burden, Racus's claim of prosecutorial misconduct on this basis fails.

E.  COMMENTS DURING CLOSING

Racus next argues that the prosecutor made improper arguments during closing by referring to evidence that was not in the record and also by appealing to the jury's passion and prejudice. We disagree.

"In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence."  *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203 (2012).  In rebuttal, a prosecutor generally is permitted to make arguments that were "invited or provoked by defense counsel and are in reply to his or her acts and statements."  *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

First, Racus argues that the prosecutor mentioned the number of people that MECTF arrested as a part of its sting operation, and mentioned that three of those arrested were sex offenders, absent any admissible evidence.  This claim fails because the State had elicited this exact evidence during trial.

Second, Racus argues that the prosecutor appealed to the passion and prejudice of the jury by arguing that MECTF was particularly noble because they were dedicated to protecting children. Specifically, he argues that the prosecutor committed misconduct by arguing that Racus and people like him, required the members of the task force to "swim in the filth of the internet."  Br. of Appellant 49; VII VRP at 1172.  Racus also argues that when the prosecutor "argued that it would

27

be improper to criticize 'what [MECTF] was doing' . . . it was clear from the argument that criticism included acquitting Racus." Br. of Appellant at 49; VII VRP at 1172. However, this mischaracterizes the State's closing argument:

> These are people who swim in the filth that's on the internet. By choice, they have to go in and read these ads. [Rodriguez] has to pose as a woman offering to sell children for sex. [Knoll] has to talk to the defendant, who wants to engage in sex with a child. [Gasser] has to pretend to be interested in sex as an 11-year-old with an adult. Can you really criticize what the MECTF is doing and what these folks are doing?

VI VRP at 1172. When viewed in context, the State's quoted argument above does not blame Racus for making MECTF do their job, nor can it be implied from the last sentence that the criticism included acquitting Racus.

Thus, because the prosecutor's arguments during closing argument did not refer to evidence outside the record nor did the arguments appeal to the jury's passion and prejudice, we hold that the arguments were not improper, and thus, Racus's claim of prosecutor misconduct on this basis fails.

F. OTHER ACTS

Lastly, Racus argues that the prosecutor committed various other inappropriate acts during the proceeding and that those acts taken together with the other allegations of prosecutorial misconduct cumulatively warrant reversal. We disagree.

"The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). To support a cumulative error claim, the appellant must demonstrate multiple errors. *In re Cross*, 180 Wn.2d at 690-91.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766.

Racus first claims that the State misstated the law and the facts when it argued to the trial court that in order for Racus to be entitled to an instruction on the affirmative defense of entrapment, Racus had to admit guilt. Even if the statement was improper, the error was harmless because Racus was not prejudiced because the evidence did not support giving the instruction on entrapment.

Second, Racus claims the prosecutor misrepresented to the trial judge what a prior judge did when he reviewed and approved the intercept authorization on December 24. In arguing to the trial judge that Racus's motion to suppress should be denied, the prosecutor stated to the trial judge "[s]econdarily, the motion should be denied because you'[re] not a reviewing court, and [the prior judge] already reviewed this case and said, 'Yes, that does establish probable cause.' Now granted, [the prior judge] didn't have the argument being made, which is that [Detective] Rodriguez lied, and so you can certainly revisit this." I VRP at 33. The prosecutor was merely explaining to the trial judge that the arguments Racus made to the prior judge related to that's judge's approval of the intercept authorization. The prosecutor then pointed out to the trial judge, that Racus now was making a different argument—that Rodriguez lied to the supervisor in order to obtain the intercept authorization. Because the prosecutor did not misstate the facts or the law in the argument he made to the trial judge, this claim fails.

Third, Racus argues that the prosecutor improperly vouched for the credibility of Detective

Rodriguez when it argued

> [The prior judge] didn't have the argument being made, which is that [Detective] Rodriguez lied and so you can certainly revisit this. The question is whether or not here is a sufficient basis upon which to impugn a 20-plus year veteran of the state patrol by saying that they discussed trading gifts is-well, anywhere close to lie, untrue, fabrication, deception, disingenuousness, whatever you want to call it.

Br. of Appellant at 49-50; 1 VRP at 34.[9] It is difficult to discern from this record what the State's

argument means, but regardless of the meaning, the State's argument here does not constitute

vouching. Thus, we hold that his claim of improper vouching fails.

In summary, the only potential errors we have identified are (1) the voir dire question

asking about whether any jurors had served on a jury panel that could not reach a verdict and

whether that experience was frustrating and (2) the prosecutor's argument to the trial court

regarding the proposed entrapment instruction. However, Racus fails to show that either of these

claimed errors resulted in a trial that was fundamentally unfair. Therefore, the cumulative error

---

[9] Racus claims that the trial court held a sidebar to admonish the prosecutor. However, he fails to cite to the record to support this statement. Thus, pursuant to RAP 10.3(a)(6) we do not reach the merits of this argument.

doctrine does not apply and reversal is not warranted. Thus, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, L.

We concur:

WORSWICK, P.J.

BJORGEN, J.