IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of:<br><br>DANIEL S. AMADOR, II,<br><br>        Petitioner. | No. 83262-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Daniel Amador was convicted of several sex offenses stemming from long-term sexual abuse of his daughter A.A. In this personal restraint petition (PRP), Amador raises several claims relating to jury selection, including that the trial court misapplied General Rule (GR) 37, erred by granting the State's peremptory challenges to two potential jurors of color, and violated his public trial rights by discussing and excusing a juror in a closed proceeding. He also alleges ineffective assistance of appellate counsel for failing to challenge the GR 37 rulings. Finally, Amador alleges trial counsel provided ineffective assistance by failing to impeach principal witnesses and failing to present additional witnesses and certain evidence. We determine that Amador's claims lack merit. Therefore, we deny his personal restraint petition.

FACTS

The facts underlying Daniel Amador's convictions from which he seeks relief are set out in our opinion affirming the convictions on direct appeal. State v.

Amador, No. 78801-9-I, slip op. at 4-5 (Wash. Ct. App. June 15, 2020)

(unpublished),

https://www.courts.wa.gov/opinions/pdf/788019%20orderopinion.pdf. There, we

described the trial testimony and the procedural facts:

> Amador served as a Seattle Police Department officer for 21
> years. Amador and his first wife Melanie had two daughters, A.A.
> and C.A. . . . Amador frequently demeaned, belittled, and
> disrespected Melanie. As a form of disciplining the children,
> Amador often used a common police "takedown technique" known
> as "pinning." "Pinnings" involved "hold[ing] the girls down by their
> arms so they couldn't get up."
>
> . . .
>
> In October 2014, Melanie learned Amador was having an
> affair. At that time, Amador moved in with his girlfriend Shannon.
> Amador and Melanie divorced in December 2015. Amador married
> Shannon in July 2016 and shortly thereafter, they had a daughter
> together.
>
> . . .
>
> The State charged Amador with one count of domestic
> violence child molestation of A.A. in the first degree, one count of
> domestic violence child rape of A.A. in the second degree, one
> count of domestic violence child rape of A.A. in the third degree,
> and one count of incest with A.A. in the first degree. The State also
> charged Amador with one count of domestic violence child
> molestation of C.A. in the third degree. Amador moved to sever the
> counts related to A.A. from the count related to C.A. The trial court
> granted his motion to sever.
> During trial, several witnesses testified about the overly
> affectionate relationship between Amador and A.A. Family friend
> Sandra McLaughlin testified that Amador and A.A. did not seem to
> have a "healthy relationship." Sandra said Amador had an
> "infatuation" with A.A. and "everything revolved around only" her.
> Melanie testified similarly, saying Amador was "obsessed" with
> A.A., starting from the time she was 4 years old. Amador would buy
> A.A. whatever she wanted and take only her on what he called
> "dates." He often described A.A. as beautiful or "hot." Melanie said
> that when A.A. turned 8 or 9 years old, Amador began showering
> with her. He continued this until A.A. moved out of the house at 19

years old. Melanie testified that she tried to confront Amador but he would not listen to her. She also testified that Amador would "make" A.A. take naps with him in his bed while he was nude. Although Melanie felt uncomfortable with this behavior, she never told anyone. When CPS became involved, Melanie minimized her concerns out of fear of losing her children.

C.A. also testified about her perceptions of the relationship between her father and A.A. Amador often told C.A. that A.A. was smarter and better behaved. He gave A.A. presents, took her on trips and outings, and "always had her by his side." C.A. testified that Amador showered with A.A. "[a]ll the time" from age eight or nine until A.A. moved out of the house during college. C.A. testified that Amador used the pinning technique on both her and A.A., but when he pinned A.A., it was usually in his bedroom with the door closed. C.A. said A.A. and Amador sometimes spent hours in his bedroom and when C.A. tried to enter the room, she found the door blocked by a dresser.

. . .

A.A. testified about her relationship with Amador. A.A. said Amador treated her far better than her mother or sister. He bought her gifts and took her out on what he referred to as "dates," including nice restaurants, shopping, and the theater. She also described pinnings from an early age. A.A. said the pinnings occurred "usually every day." When she was 9 years old, Amador would pin her on his bed and put his hand on her breast or bottom and "just talk." He also started "coming into the bathroom while [she] was showering" and getting into the shower with her. Amador would make her touch his penis "in his bedroom or in the bathroom." A.A. testified that by age 11, Amador was touching her genitals and performing oral sex on her. Amador also forced A.A. to perform oral sex on him and give him "handjob[s]." At age 12, the sexual abuse escalated to anal sex.

. . .

The jury found Amador guilty on the four counts related to A.A. Amador then entered an Alford[1] plea to an amended charge of fourth degree assault of C.A. with sexual motivation. The court imposed a concurrent indeterminate sentence at the high end of the standard sentencing range of 280 months to life.

---

[1] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Amador, No. 78801-9, slip op. at 1-6.

Amador appealed the four convictions related to A.A. Id. at 6. We affirmed his conviction on direct appeal. Amador timely filed a PRP, and this court appointed counsel.

DISCUSSION

In a PRP, the appellate court will grant relief to a petitioner who is subject to unlawful restraint. RAP 16.4(a). The restraint is unlawful if it violates the Constitution of the United States or the Constitution or laws of the State of Washington. RAP 16.4(c)(2). Relief by way of a collateral challenge to a conviction is extraordinary, and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). For a PRP based on a constitutional error, a petitioner must show a constitutional error occurred and the error resulted in actual and substantial prejudice. In re Pers. Restraint of Williams, 198 Wn.2d 342, 353, 496 P.3d 289 (2021).

Amador alleges constitutional errors stemming from the trial court's implementation of GR 37 during jury selection, ineffective assistance of appellate counsel, and ineffective assistance of trial counsel.

I.   Trial Court's Implementation of GR 37

In his initiating petition, Amador raises various "structural issues" pertaining to jury selection. First, he claims the trial court misapplied GR 37 by requiring the party making a peremptory challenge to request a preemptive GR

4

37 analysis, rather than waiting for the party opposing the peremptory to challenge it. He also claims structural error because the court limited GR 37 to "recently" oppressed groups. We disagree that these claims constitute structural error warranting relief.

A defendant has the right to a fair and impartial jury as well as the right to a trial process free from discrimination. State v. Tesfasilasye, 200 Wn.2d 345, 356, 518 P.3d 193 (2022) (citing U.S. CONST. amend. VI; CONST. art. I, § 22). "The constitutions require nothing else, but tradition, statutes and court rules created peremptory challenges." Id. "GR 37 was an attempt to address the shortcomings of Batson[2]," id. at 357, and its stated purpose is "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). "But there is no right to a peremptory challenge under either the United States Constitution or the Washington Constitution, so the erroneous loss of a peremptory challenge does not undermine the fundamental judicial process," and is not per se reversible error. State v. Booth, 22 Wn. App. 2d 565, 581-82, 510 P.3d 1025 (2022) (trial court erroneously sustained State's GR 37 challenge to defendant's attempt to exercise peremptory challenge, but denial of peremptory was not per se reversible error).

Under the established procedure in GR 37(c), either the opposing party may object to a peremptory challenge on the grounds of improper bias or the trial court may raise its own objection. In this case, the trial court instead stated that

---

[2] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

the party making the peremptory challenge against "somebody who is obviously a person of color or of ethnicity other than white" should announce they had a motion to allow for discussion.[3] This procedure was in fact *more* protective than GR 37(c) requires, as it expanded the GR 37 consideration of potential bias to *all* peremptories used against protected jurors, rather than only when challenged by the opposing party or sua sponte by the court. Amador provides no legal authority or argument as to why providing protections beyond GR 37's requirements was error.

Amador also claims the trial court's statement that GR 37 was focused "on people who have been victims of discrimination recently" was per se prejudicial. The State concedes that GR 37 applies to *any* peremptory challenge where race or ethnicity could have been a factor. However, Amador has not shown that the court's misinterpretation of GR 37 resulted in any improperly granted peremptory challenges. Even an "erroneous denial of a peremptory challenge merely results in 'the improper seating of a competent and unbiased juror.' " Booth, 22 Wn. App. 2d at 584 (quoting Rivera v. Illinois, 556 U.S. 148, 162, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009)).

The record contains evidence as to the race or ethnicity of only jurors 88, 12, and 63. Juror 88 was struck for cause on Amador's motion and without

---

[3] Amador clarified the trial court's process: "So any time somebody wants to bring a peremptory challenge against somebody who appears to be a member of a suspect class, what they do is turn to you and say, 'I have a motion.' " The court confirmed this understanding of the process.

objection by the State. Both juror 12 and juror 63 were the subject of GR 37 motions. Amador fails to show any jurors were erroneously struck because of the trial court's interpretation of the rule.

Amador has not established that the trial court's misinterpretation of GR 37, either as to process or as to whom it applies, resulted in any error.[4]

II.  Ineffective Assistance of Appellate Counsel

Amador asserts several instances of ineffective assistance of appellate counsel. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Therefore, a claim of ineffective assistance of counsel raises an error of constitutional magnitude. In re Pers. Restraint of Hopper, 4 Wn. App. 2d 838, 843, 424 P.3d 228 (2018).

To succeed on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate that defense counsel's representation fell below an objective standard of reasonableness and the deficient representation resulted in prejudice. In re Pers. Restraint of Morris, 176 Wn.2d 157, 166, 288 P.3d 1140 (2012). Prejudice requires that "there is a reasonable probability that except for counsel's unprofessional errors, the result of the proceeding

---

[4] Amador argues the court's rulings on GR 37 objections to peremptory challenges to jurors 12 and 63 constituted "structural error." These arguments pertain to the propriety of the trial court's conclusions on the GR 37 objections and are addressed within the context of his ineffective assistance of appellate counsel claims below.

would have been different." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

We need not consider both deficiency and prejudice if a petitioner fails to prove one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). But if a petitioner demonstrates both deficient representation and prejudice, they meet the burden to show a constitutional error that caused actual prejudice as required to for a personal restraint petition. Hopper, 4 Wn. App. 2d at 843-44.

A. GR 37 Challenges

Amador contends that appellate counsel for his direct appeal was ineffective by failing to raise two violations of GR 37 that would have led to a new trial.

GR 37 applies to all jury trials and aims "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). "After a [GR 37] objection has been raised, the party exercising a peremptory challenge is required to articulate its reasons for doing so." State v. Listoe, 15 Wn. App. 2d 308, 319, 475 P.3d 534 (2020); GR 37(d). "The trial court then evaluates the reasons for exercising the challenge under the totality of the circumstances." Id.; GR 37(e). If "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e). GR 37(f) defines an "objective observer" as one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful

discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." The circumstances that the court should consider include the following:

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;
>
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;
>
> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;
>
> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
>
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g). Additionally, there are presumptively invalid reasons for a peremptory challenge because they have been historically associated with improper discrimination in jury selection in Washington State. GR 37(h). The court considers these nonexclusive circumstances and keeps in mind that the test is whether an objective observer, aware of implicit, institutional, and unconscious bias, could view race or ethnicity as a factor. State v. Lahman, 17 Wn. App. 2d 925, 936, 488 P.3d 881 (2021); GR 37. We review this decision de novo. Listoe, 15 Wn. App. 2d at 321; Tesfasilasye, 200 Wn.2d at 356 (applying de novo standard of review where "there were no actual findings of fact and none of the

trial court's determinations apparently depended on an assessment of credibility").

      1.  <u>Juror 12</u>

The State moved to exercise a peremptory challenge against juror 12, who was "pretty obviously" of Asian descent. During voir dire, the State asked questions about the potential juror's expectation of DNA evidence. The State inquired "[c]an anybody think of a situation like this where you would not have DNA?" Juror 59 answered that molestation did not always have DNA because "it may not be a complete act of intercourse . . . ." Juror 89 responded that many cases do not get reported immediately after the act preventing DNA collection, and "there might be a lot of similarities in DNA." Then, juror 12 answered, "I think another instance of where DNA might not be collected is if all—if all the allegations are false and nothing actually happened." When asked to repeat the statement, juror 12 said, "DNA may not have been collected if all these allegations are false and nothing happened." The State responded, "Fair point," and moved on to ask if anyone had more to add to the conversation.

Later in voir dire, the State explored how the potential jurors decide who to believe as witnesses. Juror 12 asked whether the trial would be open to the public and clarified the reason for the question,

> The reason I was asking is in regards to -- trying to figure out if someone is telling the truth or not, if there was maybe family members in the audience, you would potentially see the reaction of the family to what the individual in the booth is saying.
> Similar to the other jurors, I think consistency amongst all of them, they're saying the same story, that is important.

The State asked for additional explanation, and juror 12 stated, "if someone was up on the court and they're telling a story that maybe is not in line with what other family members are thinking, you might see some kind of reaction from them."

The State continued to question juror 12 about this line of thinking:

> STATE: So if you saw a reaction out there to something somebody was saying up there, you would take that to mean that what the person who's up there is saying is not right?
>
> JUROR 12: That's a potential that it may not be right, or it could be surprise. There could be a lot of reasons.
>
> STATE: Could it also be that what the people out there are saying or how they're reacting is not right?
>
> JUROR 12: Yes.
>
> STATE: Okay. I just want to make sure -- I'm not going to suggest that's going to happen, but I want to make sure you are not suggesting that somebody else's reaction to what a witness says while you're listening to them will carry the day in terms of whether or not you choose to believe them.
>
> JUROR 12: Correct.
>
> STATE: It's just one of the things that can be considered.
>
> JUROR 12: Yes.

The State subsequently moved to exercise a peremptory challenge against juror 12 and offered its reasoning:

> The things that led me fairly early on to consider whether to excuse Juror Number 12, the first part was imagining situations where there would not be any evidence like DNA, and some people said things like well, a delay in reporting. Another juror, I believe 59, said molestation might not be the crime that would leave DNA. And juror 12 kind of said -- what he said is well, if the allegations are false.

The thing that put me over the hump was when we were talking about credibility, and the juror said, well, if there are family members or something in the audience and they react in a particular way, that would lead him -- could lead him to a conclusion about the believability of what the witness on the witness stand was saying.

I followed up with some questions about that. I don't remember exactly what they were, but the fact that that was something that occurred to him, the visible reaction of people who might be in the audience to something the witness is saying as indicative of their credibility, caused me concern in a case where we're not going to have any DNA, and we've got a juror who thinks that's one of the reasons that could mean innocence, and where there may be family members or supporters in the courtroom.

That was my thinking with respect to Juror Number 12.

The trial court considered the GR 37 factors, determined that none of the presumptively invalid reasons applied, and granted the State's peremptory challenge.

The State's challenge to Juror 12 was its first peremptory. The record shows that the jury venire included several African American and Asian American potential jurors. The questions asked of juror 12 were no different in type or number than those asked of the other jurors. However, in answer to the question about when there might not be DNA evidence, where others responded that delayed reporting of sexual abuse or the type of abuse at issue would impact the presence of DNA, juror 12 alone made the observation that DNA might not exist because allegations were fabricated during a discussion. This was a unique answer to the State's question, and the State asked the juror to repeat the response before moving on.

12

Likewise, juror 12's observation that body language and reactions from spectators might influence their opinion on witness credibility was within a larger discussion of how jurors would evaluate credibility. The State asked follow-up questions of several jurors, in addition to juror 12, to probe their views on credibility. Again, juror 12's answer was unique, so the State posed additional questions in order to understand the perspective. The State asked, "[c]ould it also be that what the people out there are saying or how they're reacting is not right?" to which juror 12 responded, "yes." The State wanted to ensure juror 12 was not "suggesting that somebody else's reaction to what a witness says while you're listening to them will carry the day in terms of whether or not you choose to believe them."

As a result of this exchange, Amador claims juror 12's answers "were logical and reasonable and suggested no bias against the State" such that the reasons for the peremptory challenge were "vague and unsubstantiated." But juror 12 never disavowed the idea that spectator body language could influence their assessment of credibility, agreeing that "it's just one of the things that can be considered." And, as the State notes, such reliance on spectator body language would be juror misconduct due to consideration of extrinsic evidence. A jury may not consider information outside the evidence admitted at trial. State v. Pete, 152 Wn.2d 546, 552, 98 P.3d 803 (2004). Such consideration of extrinsic evidence would be reversible error. Id.

In making its challenge, the State did not cite any of the presumptively invalid reasons listed in GR 37(h), reasons disproportionately associated with race or ethnicity, or any reasons historically associated with improper discrimination in jury selection in GR 37(i).[5] The State clearly articulated that juror 12 expressed concerning opinions on cases without DNA evidence and about consideration of external signals from spectators in assessing witness credibility. In light of the reasons cited for the State's peremptory, and the lack of reasons signaling possible discrimination, an objective observer could not view bias as the basis for the peremptory against juror 12. Accordingly, the trial court properly denied the GR 37 objection to the State's peremptory challenge to juror 12.

Because the trial court properly denied the GR 37 objection regarding juror 12, raising the issue on direct appeal would not have resulted in a new trial. Therefore, appellate counsel's failure to raise the issue was not deficient. Due to Amador's failure to prove counsel was deficient, we need not consider prejudice and conclude counsel was not ineffective. See Crace, 174 Wn.2d at 847.

---

[5] These reasons include:
(i) having prior contact with law enforcement officers;
(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;
(iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime;
(iv) living in a high-crime neighborhood;
(v) having a child outside of marriage;
(vi) receiving state benefits; and
(vii) not being a native English speaker.
GR 37(h)(i)-(vii).

2. Juror 63

During voir dire, the parties questioned jurors about their ability to remain unbiased in a case with allegations against a family member. Juror 63 stated:

> Usually people are biased in a way or have their own opinion, but in a way, this subject matter is sensitive. But for me, I feel like there's always so many -- like, I don't know anything about the case. There's always a probability that if it's a family member or something like that, there can be a misunderstanding.
> There's always many things to look at and many things to analyze. So though maybe it's a very sensitive subject, but also, there's a lot of things to see why the defendant was accused or why. There's always a reason for it.

Later, when discussing how potential jurors assess credibility, juror 63 mentioned the need for consistency:

> JUROR 63: I think -- I think the mic is off.
> But for me, I think if I'm sitting where I have to judge both parties, I have to see how consistent it is, like the other juror was saying, because -- see if their --
>
> THE BAILIFF: If you touch the bottom, it turns off.
>
> JUROR 63: I feel -- I deeply feel at a certain point that the story or their testament of both sides is very consistent, because along the way if something changes, and I would feel either they're making it up or it's -- something has changed their mind.
> But if they're consistent and throughout whatever they're saying, and you can see that it's sincere, you can sort of see by their body language, the words they use, the way they look.

Later, the State moved to use a peremptory challenge against juror 63 due to the comment about credibility:

> The State's reason for excusing her was a comment that she made regarding assessing credibility, and what she said was she has to see, I feel -- I deeply feel that -- and it's sort of unintelligible, but I deeply feel their story testament, both sides, is very consistent.

15

> Because if their story changes, then I feel like they're making it up or something changed their mind.
>
> That concerned me in a case involving such a protracted period of time of allegations, so many different interviews that have been conducted. She seemed to be more focused on a sort of consistency over a period of time that the State believes is possible [sic] in any situation and certainly not this one.

Amador declined to challenge the State's use of the peremptory, but the court undertook a GR 37 analysis as part of its independent duty because juror 63 appeared to be of Asian descent. The court granted the peremptory after its evaluation.

In this PRP, Amador raises that juror 63 was the second juror of Asian descent challenged by the State. He also points out that the State referred to juror 63's statement as "it's sort of unintelligible," which resonates with one of the reasons historically associated with discrimination in jury selection in GR 37(i).

GR 37(i) prohibits peremptories that rely on certain "conduct" or "behavior" that has "historically been associated with improper discrimination in jury selection in Washington State." One type of such conduct is that the prospective juror "provided unintelligent or confused answers." GR 37(i).

Here, however, the State relied on the substance of juror 63's statement, not her conduct or behavior. The State repeated juror 63's answer and explained the substantive concern about her method of assessing credibility. This peremptory was not because juror 63 provided "unintelligent or confused answers," but due to her clearly stated "deep feeling" that consistency was important or the witness might have made up the story.

The State acknowledged that juror 63 was the second juror of Asian descent challenged. However, the State noted that the panel included at least one other Asian-American juror, an African-American juror, and a Native American juror in an alternate chair, none of whom it intended to challenge. While other jurors expressed a similar opinion that consistency is important for credibility, none of them expressed that they "deeply feel" the importance of consistency "because along the way if something changes, and I would feel either they're making it up," as did juror 63.

Given the State's explanation and an evaluation of the other factors, an objective observer could not view discrimination as the reason for the peremptory challenge. The trial court's decision to grant the peremptory challenge was not erroneous, so challenging it on direct appeal would not have resulted in a new trial. Therefore, appellate counsel's failure to raise the GR 37 issue regarding juror 63 was not deficient. Amador's ineffective assistance of counsel claim on this basis fails.

B.  Right to Open and Public Trial

Amador also claims he received ineffective assistance because appellate counsel failed to assert that his constitutional right to a public trial was violated when the parties and the court discussed and decided to excuse juror 88 for cause during a "closed proceeding."

During voir dire, Amador asked whether any members of the venire felt they could not put their emotional reactions aside in a case involving allegations

17

of child sexual abuse and incest. Juror 88 responded that she was raised in Latin America and Venezuela and "you don't trust policemen. You grow up not to trust military or policemen. So I [am] not sure if I can completely overcome that." She also explained, "[i]t's very common that you have an uncle that touch[es] you. And that happened to my sister, that happened to my cousins, that happened to myself. And it's not an uncommon thing in [a] Latino family that you have somebody that have that kind of behaviors [sic]." After a few questions to clarify whether she could be fair to both sides, juror 88 said, "I think at this point, with [the] information that I have, it would be hard for me to put that aside." Juror 88 agreed "it is still possible" for her to put her issues aside for the case. However, when Amador asked, "Are those things you're going to be able to put aside to the extent that you find out that anyone involved in this case is Hispanic or Latino?" juror 88 stated, "[t]hat may highly influence my opinion."

Later, outside the presence of the jury panel, Amador raised the possibility of developing a challenge to juror 88 for cause and requested a chance to individually question her. The trial court noted it "was expecting the motion." After more discussion about Amador's proposed additional voir dire, the court asked whether defense counsel still wanted to go ahead with additional questioning of juror 88. Noting juror 88 had said it would be "[d]ifficult but possible" to set aside her preconceptions about Hispanic and Latino families, the court stated, "So I'll grant that challenge for cause to 88." The State expressed confusion because a challenge had not yet been made. The court then told the parties to confirm

18

whether there would be a challenge for cause and took a recess. Upon return from recess, the court resumed the discussion:

THE COURT: I understand challenge to 88, no State objection?

STATE: Correct, your Honor.

THE COURT: Granted.

The jury panel was brought back in, juror 88 was excused, and voir dire continued until a jury was empaneled.

A criminal defendant has a federal and state constitutional right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 10, 22; State v. Whitlock, 188 Wn.2d 511, 519, 396 P.3d 310 (2017). When a public trial violation is raised for the first time in a PRP, the petitioner must show actual and substantial prejudice, unless it is raised through an ineffective assistance of counsel claim. In re Pers. Restraint of Rhem, 188 Wn.2d 321, 329, 394 P.3d 367 (2017). If appellate counsel failed to raise a public trial right claim and prejudice would have been presumed on direct review, the petitioner is entitled to relief on collateral attack. In re Pers. Restraint of Salinas, 189 Wn.2d 747, 759, 408 P.3d 344 (2018). "[P]roving deficient performance necessarily requires proving that counsel should have known to raise the public trial right issue on appeal." Morris, 176 Wn.2d at 167.

To determine whether a defendant's public trial right has been violated, "the court engages in a three-part inquiry: '(1) Does the proceeding at issue implicate the public trial right? (2) If so, was the proceeding closed? And (3) if so,

was the closure justified?' " Whitlock, 188 Wn.2d at 520 (quoting State v. Smith, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014)). Whether the right to a public trial has been violated is a question of law reviewed de novo. State v. Lormor, 172 Wn.2d 85, 90, 257 P.3d 624 (2011).

It is well established that the public trial right attaches to juror challenges. State v. Schierman, 192 Wn.2d 577, 609, 438 P.3d 1063 (2018). "Conducting them in open court, where the public can monitor the parties' use of challenges, thus contributes to the fairness of the proceedings and promotes confidence in the judiciary." Id. at 609-10. The parties do not dispute that Amador's public trial right applied to the for-cause challenge of juror 88.

Instead, the parties disagree as to whether the proceeding was closed. "[A] 'closure' of a courtroom occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." Lormor, 172 Wn.2d at 93. Closure also occurs when a portion of a trial is held someplace inaccessible to spectators. State v. Love, 183 Wn.2d 598, 606, 354 P.3d 841 (2015). Safeguards for the right to public trial "come into play when the public is fully excluded from proceedings within a courtroom." Lormor, 172 Wn.2d at 92.[6]

---

[6] Even if an unjustified closure implicates a public trial right, the error may be de minimis, such that it "did not fundamentally taint the process by which the court established the facts necessary to assemble the jury or decide the case." Schierman, 192 Wn.2d at 612 (where trial court discussed and ruled on challenges for cause in chambers with parties, court found the closure de minimis because the proceeding involved no juror questioning, witness testimony, or presentation of evidence).

20

Here, the trial court did not close the courtroom to spectators. Rather, the record contains the parties' and the court's discussion of the challenge to juror 88. After defense counsel alerted the trial court that Amador planned to develop a challenge for cause, the parties and the court discussed the reasons to challenge juror 88 for cause, and the court granted the challenge, although prematurely. The court then asked the parties to "confirm" that there was a challenge for cause and that the State did not object, before going into recess. Upon return from recess, the court confirmed on the record that there was a challenge to juror 88 for cause and the State did not object, and then granted the challenge. Therefore, Amador cannot show a courtroom closure that violated his right to public trial.

Amador cannot demonstrate that he would have prevailed on a public trial violation claim on direct review. As a result, appellate counsel's failure to raise the issue was not deficient. No consideration of prejudice is required. See Crace, 174 Wn.2d at 847. Amador's ineffective assistance of appellate counsel claim fails on this ground.

III. Ineffective Assistance of Trial Counsel

Amador asserts he received ineffective assistance because trial counsel failed to impeach principal witnesses and failed to present additional witnesses and certain evidence. The standard for ineffective assistance of trial counsel is the same as ineffective assistance of appellate counsel. The petitioner must demonstrate deficient performance and resulting prejudice. McFarland, 127

Wn.2d at 334-35. Deficiency requires that counsel's performance fell below an objective standard of reasonableness based on consideration of all circumstances. In re Pers. Restraint of Hutchinson, 147 Wn.2d 197, 206, 53 P.3d 17 (2002). "[A] petitioner must show that counsel's deficiency was 'so serious as to deprive the defendant of a fair trial.' " In re Pers. Restraint of Elmore, 162 Wn.2d 236, 252, 172 P.3d 335 (2007) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

We begin with a presumption that counsel was effective. Hutchinson, 147 Wn.2d at 206. We also presume that counsel's decisions constituted sound trial strategy. Elmore, 162 Wn.2d at 252. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). "The defendant alleging ineffective assistance of counsel 'must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.' " Hutchinson, 147 Wn.2d at 206 (quoting McFarland, 127 Wn.2d at 336, 899 P.2d 1251 (1995)). The relevant question is whether counsel's choices were reasonable. Grier, 171 Wn.2d at 34.

A. Failure to Impeach Witnesses

Amador claims trial counsel failed to impeach the State's principal witnesses, A.A. and her mother, Amador's ex-wife, Melanie.[7] Generally, the

---

[7] To avoid confusion, we refer to Melanie Amador by her first name, Melanie. No disrespect is intended.

extent of cross-examination is a matter of judgment and strategy, and decisions during cross-examination will not support a claim for ineffective assistance if counsel's performance fell within the range of reasonable representation. State v. Johnston, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007) (citing In re Pers. Restraint of Davis, 152 Wn.2d 647, 720, 101 P.3d 1 (2004)). "Moreover, in order to establish prejudice for the failure to effectively cross-examine a witness, the defendant must show that the testimony that would have been elicited on cross-examination could have overcome the evidence against the defendant." Johnston, 143 Wn.2d at 20.

1. Cross-Examination of Melanie

A contested issue was why Melanie did not report Amador's unusual treatment of A.A. Melanie testified that Amador was controlling and she feared him. Melanie occasionally felt uncomfortable with Amador's treatment of A.A., but when she raised the issue he laughed at her. Melanie did not persist in expressing her concerns to Amador or anyone else.

According to Amador, "Melanie's testimony characterizing herself as a hapless weakling was very damaging to the defense because it offered the jury an explanation for why she did not prevent or stop [Amador] from abusing A.A." Before trial, Amador provided his counsel with evidence that purported to rebut Melanie's descriptions of "her place in the family dynamics" and show that she was not "too pathetic to have reported the alleged abuse." He acknowledges counsel used "some" of this information to "rebut the implication that Melanie

Amador was incapable . . . of being able to seek out help for her daughters when they needed it." However, Amador complains that counsel did not impeach Melanie with evidence that she had provided different answers during her defense interview.

During Melanie's cross-examination, trial counsel sought to ask questions about Melanie's efforts to obtain mental health treatment for her other daughter, C.A., to rebut Melanie's ineffectualness. "[T]he State just went to great lengths to show that, you know, Melanie Amador is someone who was so beaten down that she couldn't possibly get it together to get her daughters help with they needed it. And yet, here she is" getting help for her other daughter. The court allowed trial counsel to pursue this line of questioning. Trial counsel then juxtaposed that Melanie did not "shy away" from getting help for C.A., with acknowledgment that she never expressed her concerns about Amador's treatment of A.A.

Cross-examination may not have been as robust as Amador wished. "However, even a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 489, 965 P.2d 593 (1998). Here, trial counsel effectively demonstrated that Melanie was capable of helping her daughters when necessary. Counsel's efforts fell within the range of reasonable representation. Additionally, Amador has not shown that more evidence of Melanie's competence could have overcome the evidence against him. See Johnston, 143 Wn. App. at 20 ("in order to establish prejudice for the failure to effectively cross-examine a witness, the defendant must show

24

that the testimony that would have been elicited on cross-examination could have overcome the evidence against the defendant"). Counsel was not deficient for failing to further impeach Melanie. Because Amador cannot establish deficient performance, his ineffective assistance of counsel claims fails on this ground.

2. Cross-Examination of A.A.

Amador also faults trial counsel for missing the opportunity to impeach A.A. with a prior inconsistent statement. During police and defense interviews, A.A. said she confronted her father about the abuse at a Starbucks on the Saturday before Easter weekend 2016, and she did not tell C.A. until after the confrontation. During trial, A.A. testified that she had disclosed the abuse to C.A. prior to confronting her father. Trial counsel did not pursue the discrepancy during cross-examination. Amador claims this was one example of counsel's deficiency through "lackluster and incomplete cross-examinations."

As noted above, "lame" cross-examinations seldom amount to ineffective assistance. See Pirtle, 136 Wn.2d at 489. Here, counsel's failure to cross-examine A.A. about the timing discrepancy amounts to reasonable trial strategy. Counsel's cross-examination instead focused on A.A.'s previous opportunities to report the abuse and the fact that she continued to have a relationship with Amador even after leaving home. Counsel questioned A.A. about the Starbucks confrontation with Amador only briefly, to verify that nobody else was present at the meeting. Counsel's approach to the meeting was unsurprising considering A.A.'s testimony about the meeting was damaging, including that upon

25

confrontation about the years of sexual abuse and rape, Amador said "I shouldn't have done that . . . I messed up." Amador also promised her that he would not to "do the same thing" to the baby girl he was expecting with his new wife. A.A. testified that Amador asked if she was planning to tell anyone else, which "felt like he was just asking that because he didn't want to get in trouble."

Given this damaging testimony about the Starbucks meeting, trial counsel's failure to press A.A. about the timing of her disclosure to C.A. can be seen as a reasonable strategic decision to avoid revisiting highly damaging testimony. Further, C.A. had already testified that A.A. disclosed the abuse after Easter. Counsel's decision not to pursue the discrepancy was within "the range of reasonable representation," Davis, 152 Wn.2d at 720, and will not support a claim of ineffective assistance of counsel.

## B. Failure to Call Expert Witnesses

Amador claims trial counsel was ineffective for failing to call expert witnesses to respond to the State's expert witnesses because he ran out of funds during trial. "The Sixth Amendment right to effective assistance of counsel includes expert assistance necessary to an adequate defense."[8] State v. Punsalan, 156 Wn.2d 875, 878, 133 P.3d 934 (2006). However, "[t]he decision to

---

[8] Access to experts as needed is governed in CrR 3.1(f): "(1) A lawyer for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in the case may request them by a motion to the court." CrR 3.1 applies equally to indigent defendants represented by either appointed or private counsel. Punsalan, 156 Wn.2d at 880.

26

call or not to call a witness is for counsel to make." In re Pers. Restraint of

Stenson, 142 Wn.2d 710, 735, 16 P.3d 1 (2001).

    1.  Forensic Sexual Assault Nurse Examiner

Trial counsel identified Jennifer Smith, a forensic sexual assault nurse

examiner, to testify as an expert on Amador's behalf. Trial counsel disclosed

Smith as an expert who would testify about her review of A.A.'s records. Smith's

report opined:

> I would expect that a young, small-statured teen who reports
> extremely painful anal sex with ripping and bleeding from the anus
> to have symptoms recognizable by others such as family
> (particularly those responsible for doing laundry), fellow dancers,
> friends, and teachers. Physical symptoms would have included
> difficulty sitting and walking, bloody undergarments, and sore or
> edematous lips.
>
>     . . .
>
> With specific regard to injuries, symptoms, and evidence of prior
> injuries related to repeated oral sex from the ages of 10 to 19 and
> repeated anal penetration by a penis between the ages of 13 to 19,
> I have seen no medical evidence in the records reviewed that these
> acts took place.

Shortly before trial, counsel decided against calling Smith to testify. According to

Amador, trial counsel should have called Smith to testify because this evidence

was relevant and helpful to the defense.

Smith's proposed testimony was not as critical as Amador claims. When

describing Smith's proposed testimony, trial counsel told Amador,

> [S]he will not be able to say that this means [A.A.] fabricated the
> allegations. We expect her to say that the mouth and rectal area
> are parts of the body that heal quickly and that medical records are
> just a snapshot in time and do not capture the whole story and that
> the records cannot prove abuse or rule out the possibility of abuse.

This coincides with the trial testimony by the State's medical expert, Dr. Becky Weister, a professor of pediatrics and the director of Harborview Center for Sexual Assault and Traumatic Stress, who examined A.A. two years after the last alleged sexual assault:

> [W]e can see children with significant anal injuries from penetrating trauma, and within literally days, it's resolved. It's remarkable. It heals very, very quickly. And then it heals, and the anus looks like -- you know, it has a lot of little folds in it, so it has -- it's a very forgiving tissue. So mostly they -- everything just resolves.

Dr. Weister also testified that nothing in A.A.'s history would have prevented her from living a normal life and engaging in normal physical activities.

The State's medical expert provided evidence that contradicted Smith's opinion that A.A. would have experienced significant, limiting, and noticeable injury from the alleged sexual assaults. Smith also could not rule out the abuse because of the body's ability to heal the affected parts. Moreover, by the time of trial, Smith's nursing license had lapsed. Smith's opinion that no definitive evidence of the abuse existed, therefore, was cumulative of testimony by the State's more highly qualified medical expert. Trial counsel was not deficient for deciding against calling Smith as an expert witness.[9] Without establishing

---

[9] Amador claims trial counsel did not pursue the case vigorously or call expert witnesses because he exhausted his funds in the middle of trial. In support of this allegation, Amador points to an email in which counsel explained to potential expert witness Smith that "[t]he client ran out of funds part-way through trial," and inquired about the cost of the cell phone extraction expert's services prior to engaging them. The email to Smith was sent *after* trial and in response to her request for payment for services provided prior to trial. Amador's contentions are speculation. In fact, his counsel noted that his two trial attorneys each worked more than 60 hours without compensation to finish his case. To obtain relief in a PRP, the petitioner "must present evidence

deficient performance, Amador cannot demonstrate ineffective assistance of counsel.

### 2. Cell Phone Data Extraction Expert

Trial counsel contacted a cell phone data extraction expert regarding assistance reading the State's extraction report about the contents of Amador's cell phone. The report included phone activity from April 15, 2016. That day, A.A. had called Amador and accused him of sexual abuse.[10] Amador testified that he did not realize A.A. was accusing him of sexual assault and then did not deny the accusations because he believed she was experiencing a mental health crisis. The State questioned Amador to establish that despite his purported concerns about her mental health, he made no attempt to call anyone for assistance in checking on A.A.'s welfare. According to Amador, a cell phone data expert could have bolstered his theory that A.A. was having a mental health crisis by testifying that Amador tried calling Melanie twice that evening to find help for A.A., but Melanie did not answer the calls.

Even if a data extraction expert had testified that he made such calls, an expert could not provide information on Amador's purpose in making those calls.

---

showing that his factual allegations are based on more than speculation, conjecture, or inadmissible hearsay." In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

[10] Amador also complains about the poor audio quality of the recorded call, which was admitted into evidence, and an inaccurate transcript provided to the jury as a listening aid. Amador concedes the transcript was not admitted as substantive evidence and fails to explain what the errors in the transcript were or how trial counsel was deficient relating to the recording. He also fails to support this claim with authority or argument as required by RAP 10.3(a)(6). We do not consider conclusory arguments unsupported by citations to authority. Brownfield v. City of Yakima, 178 Wn. App. 850, 876, 316 P.3d 520 (2014).

Moreover, during his own testimony, Amador did not mention the calls to Melanie, nor did he ask Melanie about them, even though she had told a detective that Amador called her twice that day and she did not answer. These omissions suggest evidence that he made two calls to Melanie was not critical.

Instead, when describing the call with A.A., he testified that it "hadn't really established anything that would lead me to determine that I needed to call for assistance like a patrol response to go down there or if I needed to call my ex-wife, and have her go down there." Thus, testimony by a data extraction expert that Amador had called Melanie would have contradicted the defendant's own testimony.

In light of the other opportunities to establish evidence of the calls through lay testimony, forgoing the cell phone data expert was a reasonable trial tactic. Amador does not establish that trial counsel was deficient, therefore his ineffective assistance of counsel claim fails on this ground.

C. Failure to Introduce Evidence

Amador contends trial counsel was ineffective for failing to introduce additional evidence of A.A.'s mental health issues and his own crisis intervention training. "The decision to forgo otherwise permissible evidence does not, however, render counsel ineffective if the decision can be characterized as part of legitimate trial strategy." Matter of Lui, 188 Wn.2d 525, 552, 397 P.3d 90 (2017).

1.  Evidence of A.A.'s Mental Health Issues

Amador provided trial counsel with extensive information about A.A.'s mental health issues, including a blog entitled "My Mental Health Story," and text messages between Amador and A.A. about her mental health struggles and side effects from medication. According to Amador, trial counsel failed "to utilize existing documentation to clearly demonstrate the severity and ongoing nature of [A.A.'s] mental health challenges."

A.A. testified about her anxiety and depression and therapy to address the issues. Trial counsel cross-examined her about reactions to medication where she experienced hallucinations, including that her boyfriend was attempting to kill her. Counsel also asked A.A. about a time she had a panic attack and called Amador, who cared for her until she felt better.

A.A.'s mental health struggles were clearly raised and discussed by trial counsel. The jury could have seen Amador's introduction of the text messages and the blog posts as excessive and intrusive evidence of a teenage girl experiencing common feelings of anxiety and depression. Moreover, emphasis on A.A.'s mental health could have resulted in the jury finding her more, rather than less, credible, as one would expect significant mental health issues from long term sexual abuse.

Trial counsel's decision not to introduce additional evidence of A.A.'s mental health issues was reasonable and, therefore, not deficient performance. Amador's ineffective assistance of counsel claim fails on this ground.

### 2. Evidence of Amador's Crisis Intervention Training

Amador argues trial counsel should have introduced a Seattle Police Department report with information about crisis intervention training Amador received with the Department. According to Amador, he did not deny A.A.'s accusations of sexual abuse at the time because of his crisis intervention training. He testified,

> the best way to keep communication with somebody that is experiencing a crisis, which I knew [A.A] to have experienced in the past, is to keep sight of the fact that their perspective of reality may be different than yours, and ignoring that is not going to be beneficial to coming to a safe resolution with whatever the crisis may entail.

Because he was afraid A.A. was experiencing a mental health crisis, he relied on his training to maintain open communications and determine the type of help needed.

While Amador believes his trial counsel did not go into enough depth about his crisis intervention training, the testimony shows that counsel elicited the relevant information. Amador discussed the training, why he thought it applied, and how it impacted his interactions with A.A. Counsel's failure to pursue the issue further was not deficient, and therefore, not ineffective.

### 3. Movie Evidence

After hearing A.A.'s claims of sexual abuse, Amador conducted an internet search to find fictional works that might have inspired her to make the allegations. He discovered a 1999 British film, "The War Zone," that he considered "rife with suspicious similarities." Amador alerted trial counsel but

because they failed to investigate or ask A.A. about the film, he claims they provided ineffective assistance.[11]

Amador does not provide evidence that A.A. knew about the movie, saw it, or made her allegations based on its content. A petitioner must support their claim with more than speculation. Rice, 118 Wn.2d at 886. Trial counsel's invoice notes watching the movie after discussing with Amador. Therefore, counsel investigated and clearly chose not to pursue it further. This was a reasonable decision considering the purely speculative nature of the proposed evidence. Trial counsel was not deficient by declining to pursue the movie evidence and Amador's ineffective assistance of counsel claim on that ground fails.

### D. Closing Argument

Amador claims his counsel "erred" during closing argument by contrasting A.A.'s testimony that made no mention of bleeding due to the alleged sexual abuse with testimony by Dr. Weister that A.A. reported she had suffered a lot of bleeding. He argues that Dr. Weister's report described the bleeding in conjunction with a menstruation issue rather than from sexual abuse, and his counsel should have instead contrasted A.A.'s testimony with statements about bleeding that she made to her boyfriend.

However, Dr. Weister testified that A.A. reported, "there had been a lot of genital bleeding on occasion while the sexual abuse was going on," and "there was a lot of bleeding sometimes, that she would be chapped and hurting badly

---

[11] Appointed counsel does not raise this argument.

as well." Defense counsel contrasted Dr. Weister's testimony during closing argument:

> In addition, [A.A.] told Dr. Weister different information, and it's the kind of information that matters. She testified that she had been chapped as a result of the sexual abuse but that was it. She told Dr. Weister when she underwent that examination that she had suffered bleeding, a lot of bleeding. That's a pretty big change in story. That's the sort of thing -- that is not a fact that gets left out, and that difference is significant.

"[T]he determination of which arguments to advance in closing is a tactical decision susceptible to a wide range of acceptable strategies." State v. Israel, 113 Wn. App. 243, 271, 54 P.3d 1218 (2002). Counsel's closing argument contrasting A.A.'s testimony with her statements to Dr. Weister, rather than her statements to her boyfriend, was a reasonable trial tactic and does not demonstrate deficient performance. Thus, Amador cannot establish ineffective assistance of counsel based on closing argument.

Because Amador fails to demonstrate that he is under unlawful restraint, we deny the PRP in its entirety.

_____
Chung, J.

WE CONCUR:

_____     _____
Bowman, J                            Smith, C.J.

34